**VICTORIA W.**

v.

**Jerry J. LARPENTER, et al.**

**No. Civ.A. 00–1960.**

United States District Court, E.D. Louisiana.

May 21, 2002.

---

Linda A. Rosenthal, Julie Rikelman, Hillary Schwab, Center for Reproductive Law & Policy, New York City, William E. Rittenberg, Rittenberg & Sanuel, LLC, New Orleans, LA, Bettina E. Brownstein, Attorney at Law, Little Rock, AR, for Plaintiff.

Gustave A. Fritchie, III, Stephanie Lottinger Irwin, Irwin, Fritchie, Urquhart & Moore, LLC, New rleans, LA, Jeffrey M. Boudreaux, APLC, Houma, LA, Joseph J. Weigand, Jr., Attorney at Law, Houma, LA, for Terrebonne Parish.

L. Lane Roy, Dawn L. Morris, Preis, Kraft & Roy, Lafayette, LA, for William F. Dodd.

Danna Schwab, Schwab Law Firm, Houma, LA, Ramona N. Wallis, McNabb & Associates, Houma, LA, for Terrebonne Parish Consolidated Government, Dave Norman, Joe Null, Ed Byerly.

### *REASONS*

ZAINEY, District Judge.

Plaintiff Victoria W. filed this suit for damages pursuant to 42 U.S.C. § 1983 and Louisiana state law claiming that Defendants violated her constitutional rights under the Eighth and Fourteenth Amendments because she failed to obtain a timely

non-therapeutic abortion while incarcerated at the Terrebonne Parish Criminal Justice Complex in 1999. Plaintiff named as defendants Jerry J. Larpenter, Sheriff of Terrebonne Parish, William F. Dodd, attorney for the Sheriff of Terrebonne Parish, Joe Null, Warden of the Terrebonne Parish Criminal Justice Complex ("TPCJC"), Terrebonne Parish Consolidated Government ("TPCG"), Dave Norman, attorney for TPCG, Ed Byerly, Medical Administrator of TPCJC, Charles Spence, Medical Director of TPCJC, and their respective insurers. All defendants were sued in their individual and official capacities.

Trial was set to commence on May 6, 2002, before the bench. On March 27, 2002, the following motions were set for hearing:

Motion for Summary Judgment by plaintiff Victoria W. (Rec.Doc. 151);

Motion for Summary Judgment by defendants Jerry J. Larpenter and Joe Null (Rec.Doc. 130);

Motion for Summary Judgment by defendant William F. Dodd (Rec.Doc. 131);

Motion for Summary Judgment by defendants TPCG, Dave Norman, Ed Byerly, and Charles Spence (Rec.Doc. 138);

Motion to Strike Witness Lists by plaintiff Victoria W. (Rec.Doc. 150).

On April 10, 2002, the Court heard oral argument and took all five motions under advisement. On April 16, 2002, in light of the fast-approaching trial date and the daunting volume of documentary evidence submitted in support of the various motions, the Court issued an order without reasons granting Defendants' cross motions for summary judgment, and dismissing all of Plaintiff's federal claims with prejudice. Rec. Doc. 191.

At this time, after full consideration of the memoranda, the evidence of record, the arguments of counsel, and the applicable law, the Court issues these reasons to fully explain the April 16, 2002, order of dismissal.

## FACTUAL BACKGROUND

Plaintiff Victoria W.[1] was an inmate at the TPCJC from July 28, 1999, to October 13, 1999, serving a sentence for simple battery following revocation of probation. Upon arriving at the facility on July 28, 1999, Plaintiff received a routine physical examination which revealed that she was pregnant. Plaintiff asserts that she immediately informed the medical personnel who conducted the examination that she wished to terminate the pregnancy.[2] On July 31, 1999, a blood test taken at the Chabert Medical Center confirmed the pregnancy, and on August 6, 1999, an ultrasound conducted at that same facility revealed that Plaintiff was 15 weeks and 3 days pregnant. All of this offsite medical treatment was provided without the necessity of any court intervention nor was Plaintiff required to pay for the medical treatment she received.

On or about August 12, 1999, Plaintiff met with defendant Ed Byerly, the TPCJC medical administrator, regarding her request for an abortion. Plaintiff informed

1. Victoria W. is a pseudonym. Plaintiff's true identity has been kept under seal pursuant to an order of this Court. Rec. Doc. 76.

2. It is undisputed that an abortion was never medically necessary. To the contrary, Plaintiff has always maintained that she sought to terminate the pregnancy for emotional and financial reasons. Although Plaintiff asserts that the pregnancy was "high risk," at oral argument counsel for Plaintiff clarified that any "high risk" aspects of Plaintiff's pregnancy were relevant to the issue of damages more so than to any constitutional issue.

Byerly that she wanted an abortion and had the money to pay for it herself.[3] Plaintiff claims that during this meeting, Byerly informed her that in order to obtain an abortion she would have to hire an attorney and obtain a court order authorizing the procedure.[4]

At the August 12th meeting, Byerly attempted to assist Plaintiff by permitting her to use the telephone to phone her attorney[5] as well as several abortion clinics. Plaintiff spoke with her attorney, Howard Marcello, at that time and even asserts that Byerly took the phone from Plaintiff to explain "the court order position" to Marcello.[6] On August 19, 1999, Byerly authored a letter to the TPCJC warden, defendant Joe Null, expressing his concerns over Marcello's having not contacted the TPCJC following his conversation with Plaintiff, the timeliness of an abortion, and the possible legal implications of Plaintiff being unable to obtain an abortion within the legal time period.[7]

On or about that same date, August 19, 1999, Null delivered to Plaintiff a letter authored by defendant Dodd and addressed to Plaintiff.[8] In that letter, Dodd clarifies *inter alia* that Plaintiff would need a court order authorizing her release from the TPCJC in order to obtain the abortion and that under no circumstances would the Sheriff pay for the abortion and its attendant costs given that it was not medically required. He also acknowledged that there seemed to be some problem with Plaintiff's attorney acting on her request for the court order, but that again the Sheriff and the Parish were not required to remedy those problems or to act. In closing, Dodd stated that the letter should make clear to Plaintiff the position of the Sheriff and likely the Parish.[9] It is undisputed that this was the first and only request for an inmate abortion ever received at the TPCJC.

On September 1, 1999, Marcello filed a Motion for Reconsideration of Sentence which was heard on September 9, 1999. From the transcript of that proceeding it is clear that Marcello did not inform the court that Plaintiff sought to obtain an abortion.[10] Rather, Marcello requested that Plaintiff be excused from serving the rest of her sentence given that she was pregnant and that complications with her pregnancy rendered the prenatal care available at the facility insufficient. The judge found insufficient evidence to rule on

---

3. Exhibits Vol. I., at F; Exhibits Vol. III., at W.

4. Exhibits Vol. I, at F, ¶ 13. Byerly, on the other hand, states that he merely suggested that she contact an attorney to petition the court for her in light of the fact that the abortion was not medically necessary. Given that the procedure was not medically necessary, his department was precluded from providing it as part of inmate medical care. Deposition Excerpts, at 2, p. 106.

5. Plaintiff had appeared *pro se* at the proceeding for revocation of her probation and therefore had no attorney of her own at the time of her most recent incarceration. The attorney she contacted, Howard Marcello, had been previously retained to represent Plaintiff's daughter in an unrelated matter.

6. Deposition Excerpts, Vol. I, at 9, p. 184. Byerly, on the other hand, denies ever having spoken to Marcello. *Id.* at 2, p. 140.

7. Exhibits Vol. I, at B.

8. *Id.* at A.

9. Dodd was not an attorney for the Parish. Rather, defendant Dave Norman held that position. Other than receiving a courtesy copy of the Dodd letter, Norman had no other involvement in the events giving rise to this suit. Rec. Doc. 169, Exhibit 3.

10. Rec. Doc. 170, Exhibit E.

the motion at the time absent an evaluation by an obstetrician.[11]

For reasons unclear from the record, Plaintiff was not brought to the courtroom during the hearing on the motion to reconsider sentence, although she was in custody in the courthouse building.[12] She claims to have learned only after the hearing was over that Marcello had not informed the court of her desire to terminate the pregnancy. Marcello denies that Plaintiff ever told him that she wanted an abortion.[13] Rather, he claims that Plaintiff contacted him because of her concern for her unborn child given the inadequacies of prenatal care at the prison. It is undisputed that Plaintiff was still within the legal time limit for obtaining an abortion under Louisiana law when the motion to reconsider sentence was heard in open court. It is unclear from the record what subsequent steps, if any, Plaintiff took in furtherance of obtaining the abortion.

Plaintiff was released from the TPCJC on October 13, 1999, slightly more than 25 weeks pregnant and unable to obtain an abortion in Louisiana. She gave birth in January 2000, and placed the child with adoptive parents.

### PLAINTIFF'S ALLEGATIONS AND PRIOR PROCEEDINGS

Plaintiff filed the instant suit in July 2000, pursuant to 42 U.S.C. § 1983, and state law.[14] As for the federal claims, Plaintiff asserts that Defendants' actions, as well as the court order policy requiring her to hire an attorney, obtain a court order, and pay all attendant costs of the abortion, prevented her from exercising her constitutional right to an abortion as guaranteed by the Fourteenth Amendment.

Plaintiff also asserts that an abortion is a "serious medical need" to which Defendants were deliberately indifferent in violation of the Eighth Amendment, and that by requiring Plaintiff to carry her pregnancy to term, Defendants imposed cruel and unusual punishment in violation of the Eighth Amendment.

Plaintiff further maintains that by singling out abortion as the only type of medical care for which inmates must hire an attorney, she was discriminated against on the basis of gender in violation of the Fourteenth Amendment. Plaintiff asserts that throughout her pregnancy, including the delivery, she experienced substantial physical pain and discomfort, as well as psychological and emotional harm as a result of not being permitted to terminate the pregnancy. She seeks money damages to compensate her for the medical expenses she incurred as well as for physical and emotional suffering, attorney's fees, and punitive damages.

■ Via prior motions for summary judgment, all claims against the individual Defendants in their personal or individual

---

11. *Id.* at 4.

12. In recounting the courthouse appearance, Plaintiff seemingly attempts to implicate the Sheriff's Office as having been at fault for her not being in the courtroom. *See* Exhibits Vol. I, at F, ¶ 27; Supplemental Exhibits, at 7, p. 153. However, there is no evidence that her attorney or the district judge ever requested her presence in the courtroom. Furthermore, Plaintiff admits that the deputy sheriff in whose custody she remained called the courtroom several times to see if her presence was required. Supplemental Exhibits, at 7, p. 153.

13. Rec. Doc. 130, Exhibit C.

14. Plaintiff alleges pendant Louisiana state law claims for intentional and negligent infliction of emotional distress, as well as violations of the Louisiana Constitution. Plaintiff's Complaint at ¶¶ 103–128.

capacities have been dismissed on the basis of qualified immunity.[15] Accordingly, the only section 1983 claims remaining in this suit are those against the TPCG and the individual defendants in their official capacities. However, because a lawsuit against a government official in his official capacity is the equivalent of an action against the government entity he serves, *Ashe v. Corley*, 992 F.2d 540, 541 n. 1 (5th Cir.1993) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)), the only defendants now facing potential liability in this suit are the TPCG and the Sheriff,[16] the local entities for which the other defendants were agents.[17] Consequently, the *sole* issue remaining before this Court *vis à vis* Plaintiff's section 1983 claims is whether Plaintiff was deprived of a constitutional right by the execution of a policy adopted or promulgated by persons classified as "policy makers" for the Sheriff's Office and/or TPCG. *See Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (concluding that Congress intended for local government entities to be included among those persons to whom section 1983 applies).

## THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

Plaintiff moves for partial summary judgment on the issue of liability arguing that the undisputed facts show that Defendants adopted a policy requiring Plaintiff to hire an attorney to obtain a court order before she would be permitted to have an

15. Rec. Doc. 67 (dismissing with prejudice all individual capacity claims as to Larpenter, Dodd, and Null); Rec. Doc. 93 (dismissing with prejudice all individual capacity claims as to Norman, Byerly, and Spence). Those motions were ruled upon by Judge Porteous prior to the case being transferred to this section. Judge Porteous concluded that Plaintiff's right to a non-therapeutic abortion while incarcerated was not clearly established under either the Fourteenth or Eighth Amendments thereby entitling defendants to qualified immunity from any personal liability. This Court is in complete agreement with Judge Porteous' ruling on the qualified immunity issue. However, Judge Porteous did note that the fact that a right is not clearly established for purposes of the qualified immunity analysis does not preclude a finding that the conduct at issue was in fact unconstitutional. Rec. Doc. 67, at 12 n. 7; Rec. Doc. 93, at 9.

16. Under Louisiana law the Sheriff's Office itself is a non-entity incapable of being sued. *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273, 283 (5th Cir.2002). However, the Sheriff is an autonomous local government official separate and apart from the parish he serves. *See Burge v. Parish of St. Tammany*, 187 F.3d 452, 469 (5th Cir.1999). Because Sheriff Larpenter is sued in his official capacity, which is the equivalent of a suit against the office he holds, Larpenter is not personally liable for any judgment rendered against him in his

official capacity but rather any such judgment is to be recovered from the Sheriff's liability insurer or the public funds controlled by Sheriff Larpenter. *Id.* at 470.

17. Two departments with distinct areas of responsibility are involved in this suit. The Sheriff's Office, for which Sheriff Larpenter has final decision-making authority, has actual custody of the inmates and controls the operations of the TPCJC, where parish inmates and detainees are housed. Exhibits Vol. III, at O. The Sheriff is basically "the keeper of the jail." Rec. Doc. 131, Exhibit A, at pp. 27–28. Defendant Null, the TPCJC warden, is employed by Sheriff Larpenter. The Sheriff does not receive funding from the parish for medical care of the inmates and the Sheriff is not responsible for the medical care of inmates. *See* La. R.S. 15:705.

Responsibility for inmate medical care comes under the purview of the governing authority, the Parish (TPCG), for which defendants Byerly and Spence work.

Dodd is an attorney in private practice who provides legal counsel to the Sheriff and bills that entity on an hourly basis for legal services rendered. His work for the Sheriff comprises about 40 percent of his practice.

Dave Norman is the Parish Attorney. He performs no work for the Sheriff's Office.

abortion, and that execution of this policy caused a deprivation of Plaintiff's constitutional right to an abortion. She argues that the alleged policy is supported by no valid penological interests that would outweigh her constitutional right to obtain the abortion.

Further, she argues that abortion is a serious medical need for purposes of the Eighth Amendment and that Defendants acted with deliberate indifference to that need when they did nothing to facilitate her receiving the abortion. Finally, she argues that the alleged policy deprived her of equal protection of the laws because abortion was the only medical procedure for which a court order was required, and given that only a female inmate would seek an abortion, she was discriminated against on the basis of gender. She argues that the policy fails under all levels of review employed under an equal protection analysis.

In opposition to Plaintiff's motion for summary judgment and in support of their cross motions for summary judgment, Defendants argue that there was no "policy" involved because Plaintiff's situation was the first and only request for an abortion, and that under 42 U.S.C. § 1983 an isolated incident such as this one cannot, as a matter of law, rise to the level of a "policy." Likewise, nearly all of the defendants deny that they are "policy makers" for their respective entities such that any action on their part would be imputed to their respective governmental entities under section 1983.

Defendants also argue that Plaintiff's constitutional claims fail under the causation element of section 1983 because Plaintiff's own attorney, rather than any alleged governmental policy, caused her to forego the abortion by failing to inform the district judge at the hearing on the motion to reconsider sentence that Plaintiff wanted an abortion.[18] Next, they argue that as a matter of law a non-therapeutic abortion sought due to financial and emotional concerns is not a serious medical need for purposes of an Eighth Amendment violation. Finally, they argue that the alleged policy is not unconstitutional under the Fourteenth Amendment's guarantee of privacy because the policy is supported by valid penological interests of inmate security as well as avoidance of liability on the part of the Sheriff's Office.[19]

**18.** The Court notes that there is a disputed factual issue as to whether Plaintiff actually told her attorney that she wanted an abortion. In disposing of a motion for summary judgment the Court must of course construe the facts in the light most favorable to the non-moving party. *See Terrebonne Parish School Board v. Columbia Gulf Trans. Co.*, 290 F.3d 303, 2002 WL 731075, at *3 (5th Cir.2002) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir.1999)). Regardless of whether it was Plaintiff's failure to inform her attorney of her desire for an abortion, or the attorney's failure or refusal to apprise the Court notwithstanding a request by Plaintiff, the most direct or proximate cause of Plaintiff's inability to receive an abortion under the court order policy was that the district court was left in the dark as to the abortion issue. Whether that circumstance is sufficient to defeat Plaintiff's claim is discussed below.

**19.** Rec. Doc. 170, at 12. The individual defendants made numerous other arguments in conjunction with the cross motions for summary judgment. However, most of those arguments focus on the personal involvement of the various defendants, which while relevant to a qualified immunity analysis, is not at issue here (except to the extent that it would create a policy on behalf of the Sheriff's Office or TPCG) given that only official capacity claims remain before the Court. Accordingly, those other arguments need not be addressed as part of the disposition of the instant motions.

## LEGAL ANALYSIS

### 1. Summary Judgment Standards

In determining whether a party is entitled to summary judgment, the court views the evidence in the light most favorable to the non-moving party. *Littlefield v. Forney Indep. School Dist.*, 268 F.3d 275, 282 (5th Cir.2001) (citing *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir.1998); *Tolson v. Avondale Indus., Inc.*, 141 F.3d 604, 608 (5th Cir.1998)). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The moving party bears the burden, as an initial matter, of showing the district court that there is an absence of evidence to support the nonmoving party's case. *Id.* (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2548). If the moving party fails to meet this initial burden, the motion must be denied regardless of the nonmoving party's response. *Id.*

### 2. Section 1983 Municipal Liability/Official Capacity Claims

42 U.S.C. § 1983 provides in pertinent part:

Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983 (emphasis added).

■■■ In the landmark case of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the United States Supreme Court reversed its prior restrictive interpretation of section 1983 and held that local municipalities are "persons" subject to liability under 1983.[20] *Id.* at 848, 98 S.Ct. 2018. Imposition of section 1983 liability against a municipality is appropriate in the limited circumstance of when a constitutional deprivation (or deprivation of any federally guaranteed right) is *caused* by the *execution* of a *policy or custom* of the municipality. *Bowen v. Watkins*, 669 F.2d 979, 989 (5th Cir.1982) (citing *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037, 98 S.Ct. 2018). "This requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Burge*, 187 F.3d at 471 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). In other words, respondeat superior does not apply to municipal liability under section 1983. *See Monell*, 436 U.S. at 664 n. 7, 98 S.Ct. at 2022.[21] Simply said, "the unconstitutional

---

**20.** The Supreme Court had previously excluded municipalities from liability under section 1983 in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

**21.** A lawsuit against a government official in his official capacity is the equivalent of an action against the governmental entity he serves. *Ashe v. Corley*, 992 F.2d 540, 541 n. 1

(5th Cir.1993) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). Therefore, a defendant found liable in his official capacity faces no personal liability. *Burge*, 187 F.3d at 466–67. Rather, any judgment rendered against the defendant in his official capacity is in effect a judgment against the entity he serves.

conduct must be ***directly*** attributable to the municipality through some sort of official action or imprimatur, *i.e.,* an "official policy." *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir.2001).

■ An "official policy" is (1) a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the government entity or by an official to whom the entity has delegated policy-making authority, or (2) a persistent, widespread practice of officials or employees which although not authorized by officially adopted and promulgated policy is so common and well-settled as to constitute a custom that fairly represents the entity's policy. *Cozzo v. Tangipahoa Parish Council,* 279 F.3d 273, 289 (5th Cir.2002) (citing *Johnson v. Moore,* 958 F.2d 92, 94 (5th Cir.1992)). The municipal policy or "official policy" requirement may be met when the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy. *Burge,* 187 F.3d at 471 (quoting *Bryan County Comm'r v. Brown,* 520 397, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (Souter, J., dissenting)).

■ Because a municipality necessarily acts through its agents, the policy at issue must be set by a "policy maker," *i.e.,* the government's lawmakers, "or by those whose edicts or acts may fairly be said to represent official policy." *Burge,* 187 F.3d at 468 (quoting *Monell,* 436 U.S. at 694, 98 S.Ct. 2018, 56 L.Ed.2d 611; *McMillian v. Monroe County,* 520 U.S. 781, 784–85, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997)). When an official has final authority in a matter

involving the selection of goals or of the means of achieving goals, his choices represent governmental policy. *Id.* (citing *Schneider v. City of Atlanta,* 628 F.2d 915, 920 (5th Cir.1980); Schnapper, *Civil Rights Litigation After Monell,* 79 Colum. L.Rev. 213, 213–21 (1979)). Whether a particular official is a policy maker is a question of state law. *Id.* (citing *McMillian,* 520 U.S. at 786, 117 S.Ct. 1734). On the policy making inquiry, the court's task is to "identify those officials or governmental bodies who speak with final policymaking authority for the local government actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Burge v. Parish of St. Tammany,* 187 F.3d 452, 468 (5th Cir.1999) (citing *McMillian v. Monroe County Ala.,* 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997)).

■ Because municipal liability is imposed pursuant to execution of a policy or custom, a single, isolated unconstitutional action by "rogue" employees of the municipality will almost never trigger municipal liability under section 1983. *Piotrowski,* 237 F.3d at 578 (citing *Bennett v. City of Slidell,* 728 F.2d 762, 768 n. 3 (5th Cir. 1984); *McKee v. City of Rockwall,* 877 F.2d 409, 415 (5th Cir.1989)). However, a plaintiff may establish a custom or policy based on a single isolated decision made in the context of a particular situation if the decision was made by an authorized policy maker in whom final authority rested regarding the action ordered. *Cozzo,* 279 F.3d at 289 (citing *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Bennett v. Pippin,* 74 F.3d 578, 586 (5th Cir.1996)).

*See id.* And given that the qualified immunity defense is unavailable to a governmental entity, a defendant sued only in his official capac-

ity likewise cannot avail himself of the defense. *Id.*

In sum, municipal liability under section 1983 requires proof of three elements: a policy maker; an official policy; and a violation of constitutional rights whose "moving force" is the policy or custom, *i.e.*, causation. *Piotrowski*, 237 F.3d at 578 (citing *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037).

The initial inquiry, however, in any section 1983 suit is whether the plaintiff has in fact been deprived of a right "secured by the Constitution and laws." *Webster v. City of Houston*, 735 F.2d 838, 844, *reh'g granted*, 739 F.2d 993 (5th Cir.1984) (citing *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)).

With this legal framework in mind, the Court now turns its attention to the issue of whether, assuming *arguendo* that a municipal policy or custom existed,[22] Plaintiff was deprived of a right guaranteed by the federal constitution.

**22.** The Court has little trouble concluding that the court order policy at issue in this case constitutes an official policy, at least with respect to the Sheriff's Office, for section 1983 purposes. In his supplemental Responses to Request for Production, Exhibits Vol. III, at N, p. 11, Sheriff Larpenter acknowledges that "[i]t is an unwritten policy that when an inmate requests elective surgery, the inmate is advised to seek permission from the District Court, either *pro se* or through counsel, by filing the appropriate documents to obtain an order setting forth the parameters for the procedure, *i.e.*, who will pay the guards, if necessary, where the procedure will be performed, etc." Again, in his affidavit, Larpenter states that all inmates "who desire to have an elective medical procedure while incarcerated at the 'TPCJC,' must obtain a court order authorizing his or her release before [Larpenter] can lawfully release [the] inmate for this purpose." Exhibits Volume III, at O ¶ 9. However, the most convincing evidence of a policy is the August 19, 1999, Dodd letter. Exhibits Volume I, at A. That letter, authored by Dodd as attorney for Larpenter, explains the court order procedure in great detail and ends with a statement that the letter is intended to "make *our* position clear insofar as the Terrebonne Parish Sheriff's Office is concerned." *Id.* (emphasis added). While the Court is unpersuaded that Dodd himself was a policy maker, he clearly wrote the letter under the aegis of Sheriff Larpenter, who is undisputedly the final policy maker on behalf of the Sheriff's Office. In light of the foregoing, Defendants' argument that there can be no policy here because Defendants were responding to the first and only request for an inmate abortion is unconvincing. The "isolated or single incident" cases, which hold that a single act by municipal employees is insufficient without more to constitute a municipal policy under section 1983, *e.g.*, *Piotrowski*, 237 F.3d at 580–81, simply do not preclude liability where the policy was promulgated as a means to address the specific incident giving rise to the constitutional claim. "[I]t is well-established that a municipality may be held liable for 'course[s] of action tailored to a specific situation and not intended to control decisions in later situations,' provided that 'the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers.'" *Gonzalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 754 (5th Cir.1993) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986)). Of course, in this case, Sheriff Larpenter contends that the policy was not enacted specifically to deal with Plaintiff's request for an abortion but rather was always in effect to deal with any type of request for an elective procedure.

Plaintiff has also argued that the court order policy was attributable to the TPCG via the policy making authority of Ed Byerly, as chief medical administrator of the prison. Although it is undisputed that Byerly was among those who informed Plaintiff of the court order policy, there is really no evidence of record that Byerly actually promulgated the policy. As a practical matter, however, the Court notes that the medical staff likely had some complicity in breathing life into the policy because under Louisiana law, Byerly was prohibited from facilitating a non-therapeutic abortion, *see* La. R.S. 1299.34.5. Thus, even absent a court order policy by the Sheriff, Byerly surely would have required Plaintiff to obtain a court order authorizing the procedure prior to his participation in procuring the abortion for Plaintiff.

### 3. *Fourteenth Amendment Claim– Right to Privacy*

Plaintiff asserts that Defendants' actions, as well as the court order policy requiring her to hire an attorney, obtain a court order, and pay all attendant costs of the abortion, prevented her from exercising her constitutional right to an abortion, a right protected by the Fourteenth Amendment's right to privacy. She claims that her constitutional right to choose to terminate her pregnancy survived incarceration such that the Sheriff and medical staff were required to ensure that she obtain an abortion while in the Sheriff's custody.[23]

■ The right to privacy protected by the Fourteenth Amendment affords protection to personal decisions relating to marriage, procreation, contraception, family relationships, and childrearing. *Planned Parenthood v. Casey*, 505 U.S. 833, 870, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (citing *Carey*, 431 U.S. at 685, 97 S.Ct. at 2016). An individual has the right to be free from unwanted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child. *Id.* (citing *Eisenstadt v. Baird*, 405 U.S. at 453, 92 S.Ct. at 1038).

In *Stenberg v. Carhart*, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000), the Supreme Court recently summarized the well-established principles surrounding a woman's right to an abortion as that right has evolved in the wake of *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), decided nearly thirty years ago. First, before viability, a woman has the right to choose to terminate her pregnancy. *Carhart*, 530 U.S. at 921, 120 S.Ct. at 2604 (citing *Planned Parenthood v. Casey*, 505 U.S. 833, 870, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)). Second, a law which imposes an undue burden on the woman's decision before fetal viability is unconstitutional. *Id.* A regulation or restriction constitutes an "undue burden" when it has the purpose or effect of placing a substantial obstacle in the path of a woman seeking to abort a nonviable fetus. *Id.* Finally, subsequent to viability the state may regulate or even proscribe abortion except where necessary for the preservation of the life or health of the mother. *Id.*

In recapitulating the case law as it developed post-*Roe*, the Supreme Court has recognized that all liberties, including abortion, can be subject to state regulation without resulting in a constitutional deprivation. *See Casey*, 505 U.S. at 873–74, 112 S.Ct. at 2818–19. In other words, some laws do in effect make a right more difficult to exercise but those laws are not *ipso facto* an infringement of that right. *Id.* In particular, where abortion is concerned, numerous forms of state regulation might have the incidental effect of decreasing the availability of an abortion by making it more difficult to procure but where the law serves a valid purpose, "one not designed to strike at the right itself," the incidental effect of making it more difficult or more expensive to procure the procedure is not enough to invalidate the law. *Id.*

---

**23.** While Plaintiff has consistently framed her argument in terms of the invalidity of imposing the court order policy in the first place, what she argues in effect is that the Sheriff and/or the TPCG via the medical staff had an affirmative duty to facilitate her in procuring the abortion. Given that Plaintiff's whole suit is based upon her contention that she had a constitutionally protected right to terminate the pregnancy while incarcerated, even absent the court order policy, Plaintiff would still have had to leave the prison and travel to New Orleans for the abortion—and the only way for her to have done that is with the assistance of the Sheriff and/or the medical staff.

Beyond recognizing that the right to choose is not completely immune from state regulation, the Supreme Court has gone further, holding for instance that the government has no duty to fund abortions in order to facilitate an indigent woman's ability to obtain an abortion, even where the state chooses to fund pro-life choices. *Maher v. Roe*, 432 U.S. 464, 469–70, 97 S.Ct. 2376, 2380, 53 L.Ed.2d 484 (1977). Likewise, laws strictly forbidding the use of public funding to pay for abortions are not unconstitutional. *See Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). Moreover, the government can permissibly condition receipt of federal funding for services related to childbirth on the state's abstention from facilitating abortions in any way, including counseling and referral. *See Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). The state can validly ban any public employee within the scope of his employment from performing or assisting in an abortion, and preclude the use of public facilities for such purposes. *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 507, 109 S.Ct. 3040, 3050–51, 106 L.Ed.2d 410 (1989); *see also H.L. v. Matheson*, 450 U.S. 398, 413, 101 S.Ct. 1164, 1173, 67 L.Ed.2d 388 (1981) ("The Constitution does not compel a state to fine-tune its statutes so as to encourage or facilitate abortions.").

■ Considering the entire body of abortion jurisprudence from the High Court, all cases decided *outside* of the prison context where one would expect the right's scope to be at its broadest, it is resoundingly clear that the nature of the abortion right, as held by the United States Supreme Court, is one of protecting a woman's freedom of choice-it does not translate into an affirmative constitutional obligation on the part of the government to facilitate abortions for its citizens. *See*

*Harris v. McRae*, 448 U.S. 297, 314–15, 100 S.Ct. 2671, 2687, 65 L.Ed.2d 784 (1980). *Roe v. Wade* "did not declare an unqualified 'constitutional right to an abortion, . . . . Rather, the right protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy.'" *Maher*, 432 U.S. at 473–74, 97 S.Ct. at 2382. In short, the government has no constitutional obligation whatsoever to facilitate abortions, and can further restrict that right short of placing an undue burden on the woman's right to choose.

The more difficult issue with respect to this case of course is determining to what extent, if at all, a woman's constitutional right to choose an abortion survives in the prison context. It is well-accepted that prison walls do not completely obliterate an inmate's constitutional rights and that federal courts have a duty to protect the constitutional rights of those incarcerated. *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). However, it also well-accepted that lawful incarceration brings about the necessary curtailment of many constitutional rights. *Southerland v. Thigpen*, 784 F.2d 713, 716 (5th Cir.1986) (quoting *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)). Where a state penal system is involved, federal courts must accord a certain level of deference to the appropriate prison authorities. *Turner*, 482 U.S. at 85, 107 S.Ct. at 2259 (citing *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974)). To do otherwise would be to ignore the inordinately difficult undertaking of running a prison-an undertaking requiring expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the other two branches of government. *Id.* Furthermore, "[l]oss of freedom of choice and privacy are inherent incidents of confinement." *Southerland*, 784 F.2d at

717. Although our Constitution provides numerous protections to the accused, imprisonment pursuant to conviction "necessarily entails a far greater loss of rights." *Id.*

■ In light of these principles, the Supreme Court has recognized the need to formulate a standard of review for prisoners' constitutional claims that is both responsive to the protection of constitutional rights and the policy of judicial restraint and deference to prison authorities. *Id.* In formulating this standard of review, the Court rejected any type of heightened scrutiny that might otherwise be applicable in determining the constitutionality of state regulations that burden fundamental constitutional rights outside the prison context. *Id.* at 87, 107 S.Ct. at 2260. Rather, the proper inquiry in the prison context is whether a prison regulation that burdens fundamental rights is "reasonably related" to legitimate penological objectives.[24] *Id.* at 89, 107 S.Ct. at 2261.

■ Several factors are relevant in determining the reasonableness of a prison regulation that burdens a constitutionally guaranteed right. First, there must be a "valid rational connection" between the prison regulation and the legitimate governmental interest put forth to justify it. *Id.* at 89, 107 S.Ct. at 2262 (citing *Block v. Rutherford,* 468 U.S. 576, 586, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984)). The governmental objective must be a legitimate and neutral one and the logical connection between the regulation and the asserted goal cannot be so remote as to render the policy arbitrary or irrational. *Id.*

A second factor relevant in determining the reasonableness of a prison restriction is whether there are alternative means of exercising the right that remain open to prison inmates. *Id.* Where other avenues remain open for the exercise of the asserted right, "courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials ... in gauging the validity of the regulation.'" *Id.* (citing *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974)). A third consideration is the impact accommodation of the asserted right will have on guards, other inmates, and on the allocation of prison resources. *Id.* In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the prison's limited resources for preserving constitutional order. *Id.*

Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. *Id.* (citing *Block,* 468 U.S. at 587, 104 S.Ct. at 3233). This is not, however, a "least restrictive alternative" test but if an inmate can point to an alternative that fully accommodates the prisoner's rights at a de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard. *Id.* The *Turner* reasonableness standard analysis applies even where the challenged regulation prohibits rather than merely limits the exercise of a particular constitutional right. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). In sum, prisoners are to be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration. *Hudson v. Palmer,* 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984).

---

24. Plaintiff has not attempted to argue that the undue burden test, unique to abortion-related regulations and applicable outside the prison context, should be applied in this case.

Applying these standards, the United States Supreme Court has recognized that even the most sacred of our fundamental constitutional rights are subject to some amount of restriction in the prison context; restriction that would be impermissible outside the prison context where these same rights are likewise not without limit. *See, e.g., Lewis v. Casey,* 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (right of access to courts); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (First Amendment rights); *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1986) (inmate to inmate correspondence); *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (Search and Seizure); *Turner,* 482 U.S. at 95, 107 S.Ct. 2254 (family life and reproductive life).

Neither the Supreme Court nor the Fifth Circuit has ever addressed the extent to which the government may validly regulate or restrict access to abortions in the context of incarceration.

 It is against this legal framework that this Court must evaluate the policy at issue in this case. As an initial matter, the Terrebonne policy does not prohibit a prisoner from obtaining an abortion. Rather, in the case of an elective, non-therapeutic abortion such as the one Victoria W. sought in this case, the Sheriff and/or TPCG (via the prison's medical staff) required a court order prior [25] to either releasing Plaintiff on her own recognizance to obtain the abortion, or alternatively a court order directing the Sheriff and/or TPCG to accommodate Plaintiff's request for an abortion as would have happened had the abortion been medically required to save her life.[26] They further required Plaintiff to pay for the entire cost of the procedure.

In support of the court order policy, Defendants cite the penological interests of inmate security and avoidance of liability on the part of the Sheriff's Office.[27] Inmate security is unarguably a valid penological concern and the Supreme Court has so held. *See Block v. Rutherford,* 468 U.S. 576, 586, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984). Further, under Louisiana law, the Sheriff faces potential liability for damages sustained by those in his custody during an escape attempt or should he be found negligent in some other way for releasing a prisoner. *See Wilson v. State, Dept. of Pub. Safety & Corrections,* 576 So.2d 490 (La.1991). Any such damages are payable from the public funds allocated to the Sheriff's office or by his insurer. Thus, the Sheriff's interest and duty in avoiding liability is unarguably a valid penological objective. The issue then is

---

**25.** Plaintiff has tried to argue that the policy required her to actually hire an attorney to get the court order apparently because of the causation problem inherent under the facts of this case. However, at oral argument Plaintiff's counsel conceded that Plaintiff could have proceeded *pro se* to obtain the court order. Access to the courts did not require Plaintiff to hire an attorney. As conceded by counsel at oral argument, Plaintiff had previously acted *pro se* in conjunction with the other criminal matters including the battery charge in this case.

**26.** At oral argument, Plaintiff's counsel clarified that Plaintiff did not seek a release from custody in order to obtain the abortion, but rather transportation to an appropriate facility while remaining in the Sheriff's custody. Indeed, given that a judge had ordered Plaintiff incarcerated, and that state law only permits the Sheriff to release a prisoner under very limited circumstances, *see* La. R.S. 15:811(A), none of which apply in this case, Sheriff Larpenter had no authority to release Plaintiff from custody so that she could obtain an elective, non-therapeutic abortion.

**27.** Rec. Doc. 170, at 12.

whether the Terrebonne court order policy is reasonably related to these proffered legitimate penological objectives.

Considering the *Turner* factors pertinent to this case, the Court concludes that the court order policy is constitutionally permissible. First of all, there is a valid, rational connection between the court order policy, inmate security, and avoidance of liability. Every time a prisoner is taken from the confines of the prison facility, security and liability are unarguably issues of concern. While such "custodial releases" are inevitable such as for court appearances or for medically necessary treatment not available onsite in the prison, the Sheriff certainly has a valid interest in addressing these two issues of concern by attempting to limit the circumstances under which such releases occur. Thus, where an inmate desires a medical procedure available only offsite, and one which is completely elective in nature and unnecessitated by medical concerns, it is certainly reasonable for the prison authorities to require the imprimatur of the sentencing authority prior to tackling the security concerns of transporting a prisoner offsite, striving to maintain adequate security throughout the course of her treatment, and accepting the attendant potential liability faced anytime a prisoner in the Sheriff's custody is brought outside the prison confines.[28]

The facts of this case only serve to demonstrate this point. Abortions are not available in Terrebonne Parish. Accordingly, the sheriff would have been required to transport Plaintiff to New Orleans, over an hour away from the prison, in order to have the abortion. Obtaining the abortion involved far more than a short trip across town. As such, the concerns of security and potential liability were unarguably multiplied. Further, Victoria W. had a criminal history, including some violent episodes, and had most recently been convicted for battery when her probation was revoked. Thus, security concerns and potential liability were clearly implicated here.

Next, accommodating the abortion request would unarguably have an effect on the prison guards and prison resources generally. As noted above, the closest facility for abortions is in New Orleans which requires at least one sheriff's deputy to be gone from the facility and remain with Plaintiff at all times in New Orleans. One or more guards traveling to New Orleans with Plaintiff to accommodate her request deprives the prison of their presence and services, requiring the prison, if possible, to replace them for the duration of Plaintiff's absence. Thus, a crucial resource is affected.

Finally, there is an absence of ready alternatives for accommodating the abortion request. In fact, the alternative Plaintiff argues for, *i.e.*, eliminating the court order policy altogether, would leave the sheriff with no protections whatsoever and cause him to bear the entire risk of accommodating Plaintiff's desire for an elective procedure.

In sum, assuming *arguendo* that the right to choose to terminate a pregnancy survives incarceration, a premise in and of itself debatable under the available jurisprudence, the court order policy was a

---

**28.** The Court recognizes that a court order would not likely absolve the sheriff of all liability should his own negligence (or that of one of his employees), while having Plaintiff outside the confines of the prison pursuant to the court order, cause damage. Nevertheless, he is protected to the extent that he would avoid liability premised upon the mere fact that Plaintiff was taken out the prison in the first place-something he had no authority to do under state law.

reasonable restriction on Plaintiff's access to an abortion, and was not an "exaggerated response" to prison concerns. The policy did not absolutely prohibit or deny access to an abortion. Rather, the policy is a clear recognition of the fact that Plaintiff was incarcerated and therefore not free to come and go as she pleased. Some curtailment of even the most fundamental of rights is valid in the prison context, and the Court finds Plaintiff's right to choose between child birth and abortion was no more fundamental than other rights that are subject to some amount of curtailment in prison. Simply said, "[i]t is incarceration that impinges upon the choice to abort a pregnancy, not a [court order] regulation." *Monmouth*, 834 F.2d at 352 (Mansmann, J., concurring). Accordingly, the Court concludes that the court order policy did not deprive Plaintiff of a constitutionally protected right.[29]

In support of her claim, Plaintiff relies on *Monmouth County Correctional Insti-*

*tutional Inmates v. Lanzaro*, 834 F.2d 326, 328 (3d Cir.1987), *cert. denied*, 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988), the only case to find a court order policy like the one at issue in this case unconstitutional.[30] In a sweeping decision, the Third Circuit Court of Appeals went far beyond finding that the right to terminate a pregnancy survives incarceration. The *Monmouth* court not only found that the court order policy[31] was unsupported by valid penological objectives, but went on to conclude that the abortion right survived incarceration so much as to require the prison to fund the procedure for inmates unable or unwilling to pay.[32] *Id.* at 341. The court also concluded that the Eighth Amendment required the county to provide abortions to its inmates because abortion is a serious medical need. *Id.* at 347–48.

As its sole justification for the policy, the county had asserted that unsurmountable administrative and financial burdens

**29.** The Court recognizes that the second *Turner* factor, *i.e.*, whether an alternative means of exercising the right remains open to the prisoner, is not met by the court policy. Because the abortion procedure is "both time-bound and procedure-specific," *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 339 (3d Cir.1987), there is no alternative to a timely abortion. However, the *Turner* factors are just that-relevant factors to consider and are not required to be unanimously met. *See Turner*, 482 U.S. at 89, 107 S.Ct. at 2262.

**30.** Actually, *Doe v. Barron*, 92 F.Supp.2d 694 (S.D.Ohio 1999), is one other such case. However, in *Doe*, the district court simply adopted *Monmouth* without any analysis in the process of granting plaintiff a temporary restraining order. All of the remaining few cases addressing access to abortion in prison denied relief to plaintiff for various reasons. *See, e.g., Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.1991) (holding that mere negligence in denying inmate access to an abortion does not state a claim for a constitutional violation); *Gibson v. Matthews*, 926 F.2d 532 (6th Cir.

1991) (finding prisoner's right to abortion not clearly established).

**31.** The *Monmouth* policy was different from the Terrebonne policy in that inmates were required to obtain a court order for release on their own recognizance. Thus, maximum security inmates were completely foreclosed from obtaining abortions in *Monmouth*.

**32.** The *Monmouth* court's treatment of the funding issue is somewhat confusing. In one part of the opinion, the Third Circuit stated that the district court had erred in concluding that no prison funds need be expended for the provision of elective, nontherapeutic abortions. *Monmouth*, 834 F.2d at 341. Later in the opinion, however, the appellate court stated that the county did *not* necessarily have an affirmative obligation to appropriate funds for elective abortions-a seemingly contradictory result. *Id.* at 343. The *Monmouth* court also stated that the prison could not validly condition the provision of medical services, including abortion, on the inmate's ability and/or willingness to pay. *Id.* at 351.

would result if the county were required to provide access to and funding for elective nontherapeutic abortions.[33] The court rejected that justification concluding that if a mere lack of funding were permitted to justify such a restriction, then the state could conceivably deny virtually any constitutional right under that same argument. *See id.* at 336–37 & n. 17. On its own, the court went on to address whether legitimate security concerns, one of the same justifications offered in the instant case, could support the policy. *Id.* at 338. The court rejected that justification. *Id.* In particular, the *Monmouth* court found no greater security risk in providing an elective non-therapeutic abortion at an outside facility, than medically necessary treatment for which no court order was necessary. *Id.* Thus, the court concluded that the court order policy centered on the nature of the treatment rather than the gravity of any perceived security risk. *Id.*

This Court respectfully disagrees with the *Monmouth* court. As discussed above, the Court recognizes that when the security issue is viewed in its most narrow sense, *i.e.,* a comparison of the security risks attendant to an offsite medically necessary procedure versus one purely elective in nature, the efficacy of the court order policy vis à vis security is greatly reduced. As discussed above, prison authorities have a valid interest in minimizing instances in which their inmates are transported about the state in search of non-medically indi-

cated procedures, an aspect of security that the *Monmouth* court did not consider.

Besides its failure to recognize the validity of any restriction on the abortion right, perhaps the most troubling aspect of the *Monmouth* decision, is its imposition of an *affirmative* duty on the part of the government to preserve inviolate the abortion right during incarceration—a stance wholly at odds with the jurisprudence interpreting prisoner access to virtually every other right guaranteed by the Constitution. The gist of the *Monmouth* decision is that incarceration serves to broaden the right to abortion rather than curtail it any way—a result completely opposite from the norm. Under *Monmouth,* inmates are given far greater protections of the abortion right in prison than they ever would have been entitled to in the free world.[34] Such a conclusion is clearly at odds with the jurisprudence of the High Court as well as that in the Fifth Circuit and accords to abortion greater protections than any other constitutional right sought to be exercised within the confines of prison walls. Thus, while it is widely recognized that even the most cherished of constitutional rights are subject to curtailment or even complete prohibition for the incarcerated, *Monmouth* swings the pendulum in the other direction by elevating the abortion right above all others—including other familial and reproductive rights. *See, e.g., Southerland v. Thigpen,* 784 F.2d 713 (5th Cir.1986) (holding that female inmate's privacy right of breast feeding her newborn

---

**33.** The Third Circuit expressly noted that the county had never maintained that the policy was driven by security concerns. *Monmouth,* 834 F.2d at 337 n. 15.

**34.** Plaintiff has pointed out that while the government owes no constitutional duty to its citizens to provide medical care to those who can't afford it, such is not true while the citizen is incarcerated. Plaintiff argues that the same holds true in the context of abortion.

Such an argument is unpersuasive, however, as Plaintiff cites no authority holding that incarcerated citizens are entitled to freely obtain non-medically necessary elective procedures—an area where the Eighth Amendment does not operate. As discussed below, this Court does not agree that the Eighth Amendment guarantee against cruel and unusual punishment requires the prison to provide elective abortions.

baby did not survive incarceration); *Hernandez v. Coughlin*, 18 F.3d 133 (2d Cir. 1994) (holding that inmate has no constitutionally protected right to engage in conjugal visits); *Goodwin v. Turner*, 908 F.2d 1395 (8th Cir.1990) (holding that fundamental right of procreation does not survive incarceration to the extent that inmate has a right to artificially inseminate his wife).

Further, the exceptionally broad reach of *Monmouth* is demonstrated best by the court's requirement that the prison accommodate the abortion right in those cases where the inmate is unwilling or unable to pay for the procedure—even where public funds would necessarily have to be allocated in order to accommodate the inmate's request. Although one of the most well-settled principles of abortion jurisprudence is that the state has no obligation to fund, procure, or facilitate abortions for its citizens, *see, e.g., Maher v. Roe*, 432 U.S. 464, 469–70, 97 S.Ct. 2376, 2380, 53 L.Ed.2d 484 (1977), the *Monmouth* court nevertheless concluded that the state's custody of the inmate imposed such a burden on the prison system.[35] Thus, if *Monmouth* were followed, the inmate incarcerated for a breach of the state's laws actually comes out ahead of the game with respect to receiving a non-medically necessary abortion.

Finally, *Monmouth* was decided in 1987, prior to the post-*Roe* Supreme Court cases such as *Planned Parenthood of Southeastern Pennsylvania v. Casey*, which clarified, via the undue burden test, the valid regulations that the state can place on the abortion right even where the recipient is not serving a sentence for a violation of the law. Accordingly, this Court finds the *Monmouth* decision unpersuasive and therefore declines to follow it.

For the foregoing reasons, the Court concludes that the court order policy was constitutionally permissible. Plaintiff has failed show that she was deprived of a right guaranteed by the Fourteenth Amendment.

### *Causation Under Section 1983*

■ Although the Court concludes that Victoria W. was not deprived of a constitutional right, assuming *arguendo* that she retained an absolute right to an abortion while incarcerated, her section 1983 claim faces another hurdle in that in order to prevail, she must show that the court-order policy *caused* the deprivation of that right. Based upon the undisputed evidence in the record, Plaintiff cannot meet that burden.

As discussed above, the only remaining claims in this case are official capacity/municipal liability claims. Such claims limit liability to those deprivations directly attributable to the municipality via execution of one of its policies. The policy must be the cause in fact of the deprivation. *Spiller v. City of Texas City Police Dep't*, 130 F.3d 162, 167 (5th Cir.1997). To satisfy the cause in fact requirement, the policy must be the "moving force" of the constitutional violation. *Id.; Piotrowski*, 237 F.3d at 578 (citing *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037).

The undisputed facts of this case preclude a finding that the court order policy itself deprived Plaintiff of her right to an abortion. It is undisputed that Plaintiff was given access to an attorney and was

---

**35.** The State of New Jersey apparently had no state law like Louisiana's which prohibits any public funding whatsoever for abortions. *See* La. R.S. 1299.34.5. Nevertheless, the Court recognizes that such a distinction is of no moment because Louisiana law would be preempted if the right to public funding of an abortion were a federal constitutional right. However, it is not.

able to retain an attorney. Plaintiff was afforded a hearing before the district judge within the time frame allowed for an abortion. For reasons unclear, the district judge was never made aware of Plaintiff's desire for an abortion. The Court has no reason to doubt that Plaintiff would have received the abortion pursuant to the court order policy had the district judge only been informed of her request.[36] Nor does Plaintiff contend otherwise. Thus, the proximate cause of Victoria W.'s inability to obtain the abortion was not the court order policy but rather the fact that no one informed the district judge of her true desire.[37]

Plaintiff argues, however, that the causation requirement is met because "but for" the court order policy, the entire fiasco before the district judge would have been avoided. Relying on causation principles from tort law, she argues that her inability to timely obtain the abortion was completely foreseeable to Defendants, and that foreseeability is the "polestar" of causation. Plaintiff argues that under cases like *Perniciaro v. Brinch*, 384 So.2d 392 (La.1980), which recognize a tortfeasor's liability for aggravation of a pre-existing condition, Defendants are liable because the court order policy "aggravated" Plaintiff's pre-existing condition, in this case her pregnancy. Plaintiff's Memorandum in Support at 5 & n. 4.

Although Plaintiff's application of the causation principles surrounding pre-existing conditions under personal injury tort law is interesting and somewhat creative, the Court finds such an argument to be too much of a stretch. While common law tort principles might very well hold a tortfeasor liable for an array of damages sustained at various stages of the causation chain, municipal liability under section 1983 has very specific causation requirements which limit the liability of the municipality to those acts *directly* attributable to the policy at issue. Thus, while the court order policy unarguably played a part in the causation chain under a "but for" analysis, the direct and most proximate cause of Plaintiff's inability to obtain the abortion was the failure of her attorney to inform the district judge of Plaintiff's desire for an abortion, if in fact that occurred.

As for Plaintiff's foreseeability argument, the Court fails to see why, assuming Plaintiff had in fact told her attorney about the abortion, it would be foreseeable that an attorney at law willing to represent Plaintiff, knowing that she wanted an abortion, would then completely ignore his client's wishes as to the goals of the representation. This is especially so in light of the ethical ramifications of such action by the attorney. Plaintiff argues that the imminent failure of the court order policy in her case was not only foreseeable but actually known to Defendants in the wake of the botched hearing. The Court nevertheless fails to see how this circumstance can overcome the fact that the entire failure of the court order policy and Plaintiff's inability to obtain an abortion were direct-

**36.** Judge Porteous alluded to this potential problem when he dismissed the individual capacity claims against Defendants. Rec. Doc. 67, at 2 n. 2.

**37.** As noted above, it is a disputed fact as to whether Plaintiff's lawyer was told about the abortion. Given that this case is being decided in favor of Defendants on their motions for summary judgment, the Court must construe the facts most favorably to Plaintiff and therefore will assume that she did in fact tell her lawyer that she wanted an abortion. Naturally, if Plaintiff had been the one to misinform her lawyer, then her causation problem would be even greater. Regardless of what Plaintiff told her lawyer, the court order did not issue in this case because the district judge was left in the dark.

ly attributable to her attorney's failure to apprise the sentencing court of her true wishes. In fact, had the attorney done so, there is no reason to doubt that the court order would have issued and Plaintiff would have obtained the abortion thereby giving rise to no cause of action to bring this lawsuit in the first place. Thus, Plaintiff's Fourteenth Amendment claim is weakened even further by the causation problem inherent in the facts of this case.

### 4. Eighth Amendment Claim—Cruel and Unusual Punishment

Plaintiff argues that abortion is a "serious medical need" for Eighth Amendment purposes, and therefore, the TPCG and/or the Sheriff were constitutionally obligated to provide her an abortion. She argues that their failure to do so constitutes deliberate indifference to that "serious medical need." Recognizing that neither the United States Supreme Court nor the Fifth Circuit have found abortion to be a serious medical need, Plaintiff relies on language used in *Roe v. Wade* and other abortion cases in which the Supreme Court has recognized the "hardship" associated with seeing an unwanted pregnancy to term. Plaintiff's Motion for Summary Judgment at 28.

At its heart, the Eighth Amendment, applicable to the states through the Due Process Clause of the Fourteenth Amendment, proscribes "physically barbarous punishments." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (citing *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910)). "The Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'" *Id.* (quoting *Jackson v. Bishop*, 404

F.2d 571, 579 (8th Cir.1968)). Further, punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society" are repugnant to the Eighth Amendment. *Id.* (quoting *Trop*, 356 U.S. at 101, 78 S.Ct. at 598).

In *Estelle v. Gamble*, the Supreme Court concluded that these "elementary principles" of the Eighth Amendment noted above establish the government's obligation to provide medical care for those whom it is punishing by incarceration. 429 U.S. at 102, 97 S.Ct. at 290. Because denial of medical care may result in pain and suffering that serves no penological purpose, deliberate indifference to serious medical needs of prisoners is proscribed by the Eighth Amendment. *Id.* at 104, 97 S.Ct. at 291. Plaintiff must prove objectively that he was exposed to a substantial risk of serious harm. *Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir.2002) (citing *Estelle*, 429 U.S. at 104, 97 S.Ct. 285, 50 L.Ed.2d 251).

Applying these standards when evaluating "serious medical needs," the Fifth Circuit has found that potentially life-threatening decubitus ulcers on a paraplegic inmate constitute a serious medical need. *Lawson*, 286 F.3d at 262. The court likewise has held that a broken jaw is a "serious medical need." *Harris v. Hegmann*, 198 F.3d 153, 159–60 (5th Cir. 1999). Other courts have found that a herniated disc requiring corrective surgery, *Starbeck v. Linn County Jail*, 871 F.Supp. 1129, 1145 (N.D.Iowa 1994), coronary artery disease, *Brewer v. Blackwell*, 836 F.Supp. 631, 643 (S.D.Iowa 1993), risk of suicide, *Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir.2000), and heart attack, *Tlamka v. Serrell*, 244 F.3d 628 (8th Cir. 2001), are all serious medical needs for Eighth Amendment purposes.

■ Considering the foregoing principles and examples of serious medical needs under the Eighth Amendment, the Court is unpersuaded that a non-therapeutic abortion sought due to financial and emotional reasons is a serious medical need for Eighth Amendment purposes. When determining which types of treatment constitute a "serious medical need," the Court cannot lose sight of the Eighth Amendment context in which that analysis is made. At its heart, the Eighth Amendment protects prisoners from cruel and unusual punishment and needless suffering. An elective abortion sought for non-medical reasons such as the one at issue in this case is simply lacking in similarity and intensity to the other medical conditions that have been found to be serious medical needs under the Eighth Amendment.

That is not to say that an abortion is never a serious medical need. Surely if the abortion had been necessary to save Plaintiff's life then it would have been a serious medical need for which the Eighth Amendment would have required Defendants to provide. In other words, under the facts and circumstances of a particular case, an abortion could very well be a serious medical need. However, the Court is not persuaded by Plaintiff's argument that an abortion, regardless of the medical necessity involved, is *per se* a serious medical need for Eighth Amendment purposes. The inconvenience and financial drain of an unwanted pregnancy are simply insufficient in terms of the type of egregious treatment that the Eighth Amendment proscribes. Accordingly, the Court concludes that Defendants did not violate Plaintiff's Eighth Amendment rights.

### 5. *Equal Protection Claim*

Plaintiff argues that the Terrebonne policy singled out abortion as the only type of medical care for which a court order was required, thereby discriminating against her on the basis of gender. Plaintiff also argues that the court order policy violates equal protection guarantees because it impermissibly differentiates between abortion and other medical treatments. She argues that the policy fails under all levels of equal protection analysis from strict scrutiny to rational basis. Plaintiff's Memorandum in Support at 37–44.

Regardless of the level of scrutiny applied, Plaintiff's equal protection claim fails at the outset because there is no evidence that abortion was singled out as the only elective procedure for which a court order was required. Although Plaintiff argues that Defendants have failed to produce examples of court orders obtained in conjunction with other elective procedures, Defendants do not bear the burden of disproving Plaintiff's equal protection allegations. Plaintiffs have simply failed to proffer sufficient evidence to create any issue of fact as to the scope of the court order policy.[38] The Court therefore finds Plaintiff's equal protection challenge unpersuasive.

### CONCLUSION

The Court having considered the evidence in the record in light of the applicable law and numerous arguments presented by able counsel for all parties, concludes that Defendants are entitled to judgment as a matter of law on all federal claims brought against them in their official capacities, as well as the claims brought directly against the TPCG municipality, pursuant to 42 U.S.C. § 1983. Consequently, all of Plaintiff's federal claims are dismissed with prejudice. Further, the Court dismisses all of Plaintiff's state law claims without prejudice,

---

**38.** *See* Exhibits Vol. III, at O, ¶ 9; *Id.* at N, p. 12.

declining to retain jurisdiction over those claims absent an independent basis for subject matter jurisdiction. *See* 28 U.S.C. § 1367(c)(3).