**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 97-3302
_____

| | | |
|---|---|---|
| Sidney Knowles, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Citicorp Mortgage, Inc., | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: February 13, 1998

Filed: April 23, 1998
_____

Before McMILLIAN and WOLLMAN, Circuit Judges, and BOGUE,[1] District Judge.
_____

WOLLMAN, Circuit Judge.

      Sidney Knowles appeals from the district court's[2] grant of summary judgment in favor of defendant Citicorp Mortgage, Inc. in Knowles' action alleging violations of the Veteran's Reemployment Rights Act, 38 U.S.C. §§ 2021-2027. We affirm.

---

      [1]The HONORABLE ANDREW W. BOGUE, United States District Judge for the District of South Dakota, sitting by designation.

      [2]The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

# I.

From June 1984 to October 1992, Knowles was employed in the collections department at Citibank, F.S.B. in Miami, Florida. His most recent job title at Citibank was that of recovery supervisor. As recovery supervisor, Knowles was responsible for the direct negotiation and collection of debts and for the management of certain debt-related litigation. Knowles was also a member of the Army National Guard.

At some point in 1992, Citibank's parent company, Citicorp Banking Corporation (Citicorp Banking), decided to close Citibank's Miami office as part of a widespread downsizing of Citicorp-related entities. As Knowles was aware, this closing would ultimately result in the elimination of his position. Upon closing, the responsibility for collecting outstanding accounts from the Miami office as well as accounts from various other closing offices was to be assumed by a separate Citicorp-related entity, Citicorp Mortgage, Inc. (Citicorp) in St. Louis.

In August of 1992, Knowles was called to full time active duty with the National Guard in South Dade County, Florida, in order to provide assistance in the aftermath of Hurricane Andrew. At this time, Knowles was still employed at Citibank's Miami office. However, shortly after he was called to service, Citibank's Miami office closed, thus eliminating his position. Knowles thereafter began seeking alternative employment with other Citicorp-related entities. In late August or early September of 1992, Knowles met with Steve Halper, senior vice president of recovery at Citicorp, and Robert Oleson, assistant vice president of recovery at Citicorp, in order to discuss the possibility of obtaining employment at Citicorp's St. Louis office. Because he was on active duty, Knowles wore his military uniform to the meeting. Halper and Oleson informed Knowles that Citicorp was seeking to hire a collection

supervisor to oversee collection of the various accounts that had recently been consolidated in St. Louis.

Shortly thereafter, while Knowles was still involved with the Hurricane Andrew project, Citicorp offered him the position of collection supervisor. This decision was apparently made by Oleson and Halper, both of whom were aware of Knowles' ongoing military obligation. Citicorp informed Knowles that the position would be held open for him while he completed his emergency duties with the National Guard in Florida. In the meantime, Citicorp asked Harold "Hal" Atkinson, who had held a similar position in Citibank's Dallas office, to perform the collection supervisor duties on an interim basis.

During this interim period, in September and early October of 1992, Knowles alleges that he had two disturbing phone conversations with Oleson, who was to be his supervisor at Citicorp. In the first conversation, Oleson told Knowles that he needed him in St. Louis right away, stating, "I don't give a damn about the military. I want you up here now." In addition, Knowles claims that Oleson threatened to replace him if he did not report immediately and ended the conversation in a rude manner by abruptly hanging up the phone. According to Knowles, the second conversation was similar in content to the first, and was characterized by Oleson "yelling and screaming" because Knowles was not in St. Louis working. Knowles apparently did not discuss the nature of these telephone conversations with anyone at Citicorp.

Knowles completed his duties with the National Guard in mid-October of 1992 and reported to Citicorp's St. Louis office on October 19th. His employment with Citicorp would prove to be brief, however, for after only two weeks in St. Louis, Knowles tendered his resignation.

The source of Knowles' initial displeasure at Citicorp was the relocation package that Citicorp had offered him. Knowles felt that the relocation package was inadequate to fully compensate him for his moving expenses. Accordingly, he took steps toward seeking a more favorable package, speaking with Citicorp representatives in New York and also with Citicorp's human resources department in St. Louis. These efforts proved to be unsuccessful.

Knowles also encountered problems in his relationship with Oleson. Knowles contends that he was treated unfavorably by Oleson because of his status as a member of the Army National Guard. In support of this contention, Knowles cites three separate incidents that allegedly occurred during his initial week at Citicorp. First, Knowles was confronted by a co-worker, Craig Page, who yelled at him and referred to him unpleasantly as "Mr. Boss." When Knowles informed Oleson of this occurrence, Oleson laughed and took no further action. Second, Oleson did not allow Knowles to hold meetings with the collectors he was hired to supervise because Oleson wanted Hal Atkinson, who had been supervising the collectors on an interim basis, to hold the meetings. Finally, Knowles claims that Oleson told him during a private meeting that he did not want Knowles working for him, that he did not like the military, and that the military "was not going to dictate to him about his people." Brief of Appellant at 8.

Despite his displeasure with these occurrences, Knowles returned to Citicorp for a second week of work. During this second week, he began searching for an alternative position at Citicorp. This search was unsuccessful. Finally, near the end of his second week, Knowles met with Christa Nolfo, a Citicorp human resources representative, and with Oleson. Knowles informed Nolfo and Oleson that he was not going to remain in the collection supervisor position. Nolfo asked Knowles the reason he was leaving, but Knowles did not elaborate. Nolfo then asked Knowles if he would be willing to explain his reasons for leaving the position in writing. In

response to this request, Knowles composed a handwritten resignation letter that read, in its entirety:

10-29-92

To Christa Nolfo:
I must refuse the position as a recovery supervisor only because of the relocation package. Otherwise I would very much like the position.
Sid Knowles

Defendant's Exhibit C, Joint Appendix at 144.

Knowles claims that Oleson pressured him into writing this letter and that the letter does not accurately reflect his true reason for declining the position. He argues that his resignation was precipitated not by the inadequacy of his relocation package, but by the intolerable working environment to which he was subjected on account of his status as a member of the National Guard. Nevertheless, Knowles made no attempt to apprise anyone in Citicorp's human resources department of his mistreatment, nor did he discuss Oleson's conduct with his fellow employees. Knowles does contend, however, that he discussed Oleson's conduct with Steve Halper, Oleson's immediate supervisor, and that Halper was unreceptive to his complaints.

Following his resignation, Knowles initiated this action, which alleged that Citicorp had violated the Veteran's Reemployment Rights Act (VRRA) by: (1) failing to reemploy him upon the completion of his active service duty; and (2) constructively discharging him because of his National Guard status. The district court granted summary judgment in favor of Citicorp on both claims.

**II.**

We review a grant of summary judgment de novo, applying the same standard as that applied by the district court. See Rose-Maston v. NME Hospitals, Inc., 133

F.3d 1104, 1107 (8th Cir. 1998). Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. See id.

Knowles' claim that Citicorp violated the VRRA by failing to reemploy him upon the conclusion of his active service with the Army National Guard is without merit. It is undisputed that Knowles was employed by Citibank in Miami, Florida, at the time he was called to full time duty with the National Guard. Equally undisputed is the fact that Knowles was not employed by Citicorp until after his National Guard obligations had ceased. Citibank and Citicorp are each wholly-owned subsidiaries of Citicorp Banking, but they are nevertheless separate entities. Thus, because it did not employ Knowles prior to his assumption of full time National Guard duties, Citicorp was under no obligation to "reemploy" him upon the conclusion of such duties.

Moreover, Knowles himself testified in his deposition that Citicorp offered him a position as a collection supervisor in its St. Louis office and that the duties and responsibilities of this position were essentially the same as those involved in his prior position with Citibank. Thus, even if the VRRA could be read to impose an obligation on Citicorp to reemploy Knowles, Citicorp fulfilled any such obligation.

**III.**

We turn, then, to Knowles' assertion that he was constructively discharged in violation of the VRRA. The law in effect at the time Knowles left Citicorp provided: "Any person who [is employed by a private employer] shall not be denied hiring, retention in employment, or any promotion or other incident or advantage of employment because of any obligation as a member of the Reserve component of the

-6-

Armed Forces." 38 U.S.C. § 2021(b)(3). Knowles contends that the circumstances surrounding the cessation of his employment at Citicorp amounted to a constructive discharge in violation of section 2021(b)(3). As Knowles concedes, his section 2021(b)(3) claim is actionable only if he was in fact constructively discharged and if his National Guard status was the sole cause for his discharge.[3]

A constructive discharge occurs when an employer deliberately renders an employee's working conditions intolerable with the intent of forcing the employee to leave the employment. See Bradford v. Norfolk Southern Corp., 54 F.3d 1412, 1420 (8th Cir. 1995). A plaintiff can satisfy the intent requirement by demonstrating that his resignation was a reasonably foreseeable consequence of the employer's actions. See Parrish v. Immanuel Med. Ctr., 92 F.3d 727, 732 (8th Cir. 1996). Moreover, the intolerability of the working conditions is judged by employing an objective standard; conditions are considered intolerable "if a reasonable employee would find them as such." Bradford, 54 F.3d at 1420.

---

[3]In 1981, the Supreme Court set forth the "sole cause" standard when interpreting 38 U.S.C. § 2021(b)(3). See Monroe v. Standard Oil Co., 452 U.S. 549, 559 (1981). The Court held that the VRRA "was enacted for the significant but limited purpose of protecting the employee-reservist against discriminations like discharge and demotion, motivated *solely* by reserve status." Id. (emphasis supplied). Consistent with the Court's decision, our subsequent cases have held that in order for a section 2021(b)(3) claim to succeed, the plaintiff's reserve status must have been the sole motivation for the adverse employment action. See Clayton v. Blachowske Truck Lines, Inc., 815 F.2d 1203, 1205 (8th Cir. 1987). Although the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), 38 U.S.C. § 4311(b) replaced the "sole cause" standard with a "motivating factor" standard, we have held that this provision is not to be applied retroactively. See Newport v. Ford Motor Co., 91 F.3d 1164, 1167 (8th Cir. 1996). Thus, the "sole cause" test articulated in Monroe applies to Knowles' 1992 claims.

We conclude that the evidence presented by Knowles is insufficient as a matter of law to establish a constructive discharge. As we have repeatedly held, an employee's duty to act in a reasonable manner includes "an obligation not to assume the worst and not to jump to conclusions too quickly." Tidwell v. Meyer's Bakeries, Inc, 93 F.3d 490, 494 (8th Cir. 1996); see also Gartman v. Gencorp, Inc., 120 F.3d 127, 130 (8th Cir. 1997). Thus, "[a]n employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." Tidwell, 93 F.3d at 494; see also Hanenburg v. Principal Mut. Life Ins. Co., 118 F.3d 570, 575 (8th Cir. 1997); Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 574 (8th Cir. 1997); West v. Marion Merrell Dow, Inc., 54 F.3d 493, 498 (8th Cir. 1995). Although we are not without sympathy for Knowles' situation, we agree with the district court's conclusion that Knowles jumped to conclusions too quickly and failed to afford Citicorp a reasonable chance to address his concerns.

Although Knowles argues that he exhausted all avenues of relief in seeking a solution to his problems at Citicorp, the record reveals that, aside from discussing Oleson's comments with Halper, he took few, if any, steps toward this end. Knowles neglected to so much as mention his concerns to anyone in Citicorp's human resources department or to any of his co-workers. Furthermore, he made no attempt to utilize Citicorp's internal grievance procedures or even to inquire about the possibility of doing so. See Boze v. Branstetter, 912 F.2d 801, 805 (5th Cir. 1990) (employee alleging discrimination in performance evaluations did not act reasonably when he resigned without pursuing internal grievance procedures).

Even when asked directly by Citicorp human resources representatives about his reason for resigning, Knowles failed to mention any problem with Oleson. Instead, he explained in his resignation letter that he was leaving "only because of the relocation package" and that he "otherwise would very much like the position." Defendant's Exhibit C, Joint Appendix at 144. Knowles now asserts that this letter

was the product of Oleson's coercive conduct and that it does not represent his true reasons for leaving. This characterization of Oleson's conduct, however, seems exaggerated. Moreover, even if we accept Knowles' assertions, the resignation letter still serves as an example of his decision to forgo utilizing any remedial procedures that might have afforded Citicorp a reasonable opportunity to rectify the situation.

During his brief employment at Citicorp, Knowles was persistent in expressing his dissatisfaction with his relocation package. On more than one occasion, he contacted Citicorp representatives in New York or Citicorp Human Resources representatives in St. Louis in an attempt to obtain a more generous renumeration. Yet Knowles failed to take any similar steps to inform Citicorp of Oleson's conduct. Instead, Knowles simply resigned, offering a reason that is inconsistent with the explanation he now submits. We therefore conclude that the district court did not err in ruling that Knowles was not constructively discharged.

The judgment is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.