# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3108

_____

Jane Roe,      *
     *
        Appellee,      *
     *
     *    Appeal from the United States
    v.      *    District Court for the
     *    Western District of Missouri.
Larry Crawford, Director of the      *
Missouri Department of Corrections;      *
Cyndi Pruden, Acting Superintendent      *
Women's Eastern Reception,      *
Diagnostic and Correctional      *
Center, in her official capacity,      *
     *
        Appellants.      *

_____

Submitted: September 24, 2007
Filed: January 22, 2008

_____

Before WOLLMAN, HANSEN, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

The Missouri Department of Corrections (MDC) instituted a policy of prohibiting transportation for elective, non-therapeutic abortions (MDC policy). Plaintiff Jane Roe (Roe) requested transportation for an elective abortion, and was denied. The district court granted Roe's request for emergency preliminary injunctive relief, and ordered the MDC to provide Roe with transportation outside of the MDC

facility (referred to by the parties as an "outcount"). Roe amended her complaint and sought injunctive relief on behalf of a class consisting of all women in the custody of the MDC who seek elective, non-therapeutic abortions. The district court certified the class (Plaintiffs). Both parties moved for summary judgment, which the district court granted in favor of the Plaintiffs. The district court reasoned the MDC policy is unreasonable under the Fourteenth Amendment using the four-part test established by Turner v. Safley, 482 U.S. 78, 89-91 (1987) for reviewing the reasonableness of prison regulations impacting constitutional rights. The district court also found the Plaintiffs' Eighth Amendment rights were violated, determining that the desire for an elective abortion constitutes a serious medical need to which the MDC officials were deliberately indifferent. On appeal, the MDC contests both findings. Although we conclude the district court erred in its Eighth Amendment analysis, and on one aspect of the Turner analysis, we affirm the ultimate judgment.

## I.    BACKGROUND

Before September 5, 2005, the MDC had a policy of providing transportation outcounts for inmates wanting to terminate their pregnancies. On that date, the MDC altered its policy, such that inmates would be transported for abortions only "[i]f [the] abortion is indicated due to threat to the mother's life or health, and if approved by the Medical Director in consultation with the Regional Medical Director." The MDC cited security concerns and cost savings motivating the change in policy. Although treatments for other conditions and injuries may be classified as elective, the attending physician may override the general policy of denying elective medical outcounts and authorize the outcount by determining that the care is in fact medically necessary. However, under the policy regarding abortions, the MDC determined "[o]utcounts for elective abortions will no longer be authorized."

Plaintiff Roe, on behalf of herself and others similarly situated, challenged the legality of this MDC policy in federal district court. The district court granted summary judgment in favor of Roe, reasoning that under the Turner four-part

reasonableness test, the MDC policy was an unreasonable restriction on inmates' Fourteenth Amendment right to terminate a pregnancy. Roe v. Crawford, 439 F. Supp. 2d 942, 949-53 (W.D. Mo. 2006). The district court also found Roe's Eighth Amendment rights were violated, determining the desire for an elective abortion constitutes a serious medical need to which the MDC officials were deliberately indifferent. Id. at 953.

## II.    STANDARDS OF REVIEW

We review the grant of summary judgment de novo, viewing the record most favorably to the non-moving party. Tipler v. Douglas County, 482 F.3d 1023, 1025 (8th Cir. 2007). Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); accord Knowles v. Citicorp Mortgage, Inc., 142 F.3d 1082, 1085 (8th Cir. 1998).

Certain guiding principles come into play when federal courts review policy decisions made by a state's executive branch. Specifically, "[w]here, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." Rizzo v. Goode, 423 U.S. 362, 378 (1976) (quotation omitted); see also Angela R. v. Clinton, 999 F.2d 320, 326 (8th Cir. 1993) ("Federal courts operate according to institutional rules and procedures that are poorly suited to the management of state agencies.").

## III.    DISCUSSION
### A.    Turner Supplies the Appropriate Test

The district court found the applicable test for determining the constitutionality of the MDC policy was that articulated by the Supreme Court in Turner. Roe, 439 F. Supp. 2d at 947-49. Roe contended, as she did in her opening brief on appeal, that Turner is inapplicable and her Fourteenth Amendment claim should be subjected to

the same standard of review that would apply outside of the prison context.  See id. at 947 (maintaining that the "undue burden" test should apply).[1]  Essentially, Roe argued that the Supreme Court's decision in Johnson v. California, 543 U.S. 499 (2005) should be extended.  See Roe, 439 F. Supp. 2d at 947-49.  In Johnson, the Supreme Court reviewed a policy that separated inmates on the basis of race.  543 U.S. 507-08.  In so doing, the Court articulated that it had consistently held "that *all* racial classifications [imposed by government] . . . must be analyzed by a reviewing court under strict scrutiny."  Id. at 505 (citation and internal quotation marks omitted).  The Court reasoned the Turner test had never applied to racial classifications, and applied "*only* to rights that are inconsistent with proper incarceration."  Id. at 510 (quotation marks and citation omitted).

Racial classifications are viewed as immediately suspect, see id. at 509, and their usage can seriously damage the integrity of a prison system.  See id. at 510-11.  On the contrary, Turner applies to prison restrictions relating to rights *not* typically subject to strict scrutiny.  See id. at 510 (listing First Amendment rights, access to courts, attendance at religious services, and some due process claims such as involuntary medication and restrictions on the right to marry, as remaining subject to Turner).  Restrictions on abortion are not subject to strict scrutiny, but are void only when they place an "undue burden" on access to abortion.  See Planned Parenthood v. Casey, 505 U.S. 833, 874 (1992).  Additionally, like marriage or attendance at religious services, access to abortion involves burdens on the prison system concerning allocation of resources which necessitate either allowing inmates out of the prison setting, or bringing persons into the facilities.  Simply refraining from classifying prisoners on the basis of race involves no such burden.  Johnson, 543 U.S. at 510 ("The right not to be discriminated against based on one's race . . . is not a right that need necessarily be compromised for the sake of proper prison administration.").

---

[1]During oral argument, Roe conceded the applicable test in the prison context is still Turner.  We agree, and for completeness, we address the issue.

The district court thus properly declined to apply the "undue burden" test in this matter, and <u>Turner</u> represents the proper framework for analysis.[2]

### B.    Applying <u>Turner</u>

Prison regulations restricting constitutional guarantees are valid only if the regulations are "reasonably related to legitimate penological interests." <u>Turner</u>, 482 U.S. at 89. To determine whether a prison regulation is reasonably related to a legitimate penological interest, courts consider (1) whether there exists a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of

---

[2]The MDC recognizes the Supreme Court in <u>Roe v. Wade</u>, 410 U.S. 113 (1973), determined women have, within certain boundaries, a right to elect to terminate their pregnancies. Nevertheless, the MDC argues, because the right is grounded in the right to privacy, and some privacy interests are inconsistent with imprisonment, the privacy right to terminate a pregnancy does not survive incarceration. However, this argument does not withstand analysis. Although some rights may be so inherently inconsistent with incarceration, such as the right to travel, that any assertion of the right while in prison would automatically fail, even rights that are, in part, inconsistent with incarceration survive imprisonment, at least enough so that the <u>Turner</u> balancing test applies. Indeed, while contending that rights stemming from the right to privacy are automatically lost upon incarceration, the MDC admits "decisions about marriage" are among such privacy rights. This admission then fails to recognize the <u>Turner</u> decision *itself* struck down a regulation prohibiting marriage. <u>See</u> 482 U.S. 94-99. In so doing, the Supreme Court recognized that "[t]he right to marry, like many other rights, is subject to substantial restrictions as a result of incarceration." <u>Id.</u> at 95. But, the right to marry does not completely disappear upon imprisonment. <u>See id.</u> at 96. Prison regulations impacting the right to marry may well be upheld, but must at least survive the scrutiny of the <u>Turner</u> balancing test. <u>Id.</u> Logically, this same analysis holds true for access to abortions as well. Certainly, no prisoner could simply elect to leave the institution at will to obtain an abortion. This does not, however, mean any exercise of the right is entirely inconsistent with incarceration, any more than is marriage, or the right to correspond with persons outside of the facility. <u>See</u> <u>Turner</u>, 482 U.S. at 91-92.

exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) the existence, or absence of "obvious, easy alternatives . . . that fully accommodate[] the prisoner's rights at *de minimis* cost to valid penological interests." Id. at 89-91 (citations and internal quotation marks omitted).

### 1. Reasonable Relationship to Legitimate Penological Interests

Roe argues the MDC's claim of security concerns was feigned, and the MDC was not entitled to Turner deference. The district court noted that, at the summary judgment stage, such a determination would be inappropriate because there existed at least a genuine issue of material fact regarding the sincerity of the MDC's asserted security concerns. Roe, 439 F. Supp. 2d at 950. The district court therefore accepted the security concerns as credible. Id. This determination was appropriate, and is supported by the prison administrators' testimony articulating security concerns as a motivating factor for the change in the MDC policy. The district court then found the MDC policy does not rationally and actually advance the legitimate security interest. Id.

The MDC asserts alternate ways in which the policy purportedly advances security interests. First, the MDC contends *any* time an inmate is removed from prison, security is at risk. The MDC argues "[r]educing security risks by reducing the number of outcounts is a rational means of furthering the legitimate penological interest in prison security." The problem with this argument is that, based on the record, the MDC policy does not appear to reduce the number of outcounts. For example, other than for those inmates released before carrying their children to term, the MDC would still need to transport the pregnant inmates on outcounts for medical examinations associated with pregnancy, including delivery. During a pregnancy, the MDC refers inmates for outcounts for a number of procedures, including some of the ultrasounds. Although the MDC argues abortions may require two days, so do some

deliveries. Many of these procedures are provided at the expense of Correctional Medical Services, which contracts with the MDC for the care of inmates. Inmates tend to have higher pregnancy-risk factors than the general population, necessitating increased levels of prenatal care, which could increase the number of outcounts necessary during the continued pregnancies. Thus, the MDC policy does not necessarily reduce the number of overall outcounts and the related security risk.

Second, the MDC claims the existence of protesters and the configuration of the clinic result in higher risks to the guards and inmates, as well as a greater potential for inmates to escape. Id. The concerns about heightened risks for the guards and inmates represents a far more defensible argument. Accepting, as the district court did, that security concerns formed the basis of the MDC policy, sufficient evidence in the record demonstrates an attempt to minimize outcounts for abortions rationally advances this legitimate concern. For instance, a local Planned Parenthood President and CEO testified large numbers of protesters regularly picket the facility, write down license plate numbers, and photograph and videotape the entering vehicles. Although the district court found it was "undisputed that in the past eight years, picketers have never interfered with the safety or security of . . . inmates or staff," id., this conclusion does not automatically make the MDC policy irrational. Prison officials should not be required to wait until a problem occurs before addressing the risk. See Turner, 482 U.S. at 89 (reasoning prisons should have the authority "to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration.").

Roe argues that deferring to this security interest would create an impermissible "heckler's veto," and that the government cannot allow protesters to effectively block the exercise of a legally protected activity.[3] Although logically analogous, the

---

[3]The "heckler's veto" involves situations in which the government attempts to ban protected speech because it might provoke a violent response. See, e.g., Cohen v. California, 403 U.S. 15, 23 (1971). In such situations, "the mere possibility of a

"heckler's veto" has been disapproved more in the context of First Amendment freedom of speech, and as it relates to the general public. See, e.g., Lewis v. Wilson, 253 F.3d 1077, 1081-82 (8th Cir. 2001). If the State of Missouri banned abortion in general, on the basis of concerns about societal disruption due to protests at the clinics, the principle would no doubt apply and the government would be required to take steps to ensure access, rather than enacting a ban. In the prison context, it is already established that whether or not a policy infringing on constitutional rights is valid depends on a balancing test which grants far more leniency to prison administrators than the government would be granted as to the general public. See Turner, 482 U.S. at 89-91. Additionally, the relative availability of the right at issue is appropriately addressed by the second Turner factor. See Turner, 482 U.S. at 90.

Given the deference owed to prison officials in such matters, see Rizzo, 423 U.S. at 378, the district court erred in finding the MDC policy is irrational simply because no problems occurred in the past.[4] However, the Turner analysis does not end here. Turner, 482 U.S. at 89-91.[5]

---

violent reaction to [protected] speech is simply not a constitutional basis on which to restrict [the] right to speak." Lewis v. Wilson, 253 F.3d 1077, 1081 (8th Cir. 2001) (citing Cohen, 403 U.S. at 23).

[4]The MDC's contention that inmates removed from the facility for abortion outcounts are more likely to attempt an escape than inmates transported for other medical outcounts is less convincing. In contrast to inmates transported for labor and delivery, inmates on abortion outcounts are always physically guarded both during transport and at the facility.
Additionally, for the reasons stated previously, the MDC's argument that the MDC policy results in cost reductions by lessening the number of outcounts is without sufficient evidentiary support.

[5]Although Monmouth County Corr. Instit. Inmates v. Lanzaro, 834 F.2d 326 (3d Cir. 1987), supports Roe's case in other respects, Monmouth County officials did not assert security as a justification for its policy. See id. at 336 & n.15.

## 2.     Alternative Means of Obtaining an Elective Abortion

The "second factor relevant in determining the reasonableness of a prison restriction . . . is whether there are alternative means of exercising the right that remain open to prison inmates." Turner, 482 U.S. at 90. The district court found the MDC policy entirely eliminated Plaintiffs' access to elective abortions. Roe, 439 F. Supp. 2d at 951-52. This determination is correct, and weighs heavily against the validity of the MDC policy. Under the MDC policy, transportation outcounts are provided *only* for medically necessary, therapeutic abortions due to a threat to the mother's life or health. Once incarcerated in the MDC, an elective abortion, which the Supreme Court determined is a liberty interest protected under the Fourteenth Amendment, is *entirely* unavailable. The MDC recognizes this, and argues alternative means of obtaining an elective abortion exist: that is, the inmates can obtain an abortion before incarceration. This contention lacks merit. First, many inmates either will not know of their pregnancies, or will not have elected to terminate their pregnancies, before incarceration. Second, the MDC points to no authority, and we find none, indicating the Supreme Court has determined a right may be entirely eliminated during incarceration, simply because the right could have been exercised before imprisonment. In Turner, the Supreme Court struck down a regulation prohibiting marriage other than in exceptional circumstances. Turner, 482 U.S. 96-99. Under the MDC's reasoning, a complete prohibition on marriage would have been valid, because the inmates could have chosen to marry before beginning their prison terms, or after the imprisonment ended.

In the case lending the most support to the MDC's position, Victoria W. v. Larpenter, 369 F.3d 475 (5th Cir. 2004), the policy upheld by the Fifth Circuit did not act as a complete bar to elective abortion. See id. at 486 ("Elective [abortion] is not prohibited . . . [r]ather, an inmate can receive the [abortion] by following a set procedure."). The policy in Victoria W. created an administrative hurdle, requiring inmates to obtain a court order authorizing an elective abortion before obtaining one. Id. at 477, 486. The goals of lessening outcounts, and of providing a layer of liability protection for the correctional facility, were recognized as valid. Id. at 486. The

policy was rationally related to these goals, and there were alternatives available, because the procedure was not onerous, and did not act as a complete bar to elective abortion. See id. at 486-87. The Fifth Circuit even distinguished Monmouth County Corr. Instit. Inmates v. Lanzaro, 834 F.2d 326 (3d Cir. 1987), because the policy at issue in Monmouth "required inmates to get a court order releasing them *on their own recognizance*, making it *more difficult* for full-security inmates to obtain an order of release." Victoria W., 369 F.3d at 488 (emphasis added). The Fifth Circuit recognized that "*[c]ritically*, the options allowed by the [policy at issue], *unlike the policy in Monmouth*, ensure that a pregnant inmate who wants an abortion will obtain a court order." Id. (emphasis added). The MDC's policy goes far beyond the policy upheld in Victoria W., and beyond the policy struck down in Monmouth (a requirement that the inmate obtain a court order allowing temporary release without supervision). Monmouth, 834 F.2d at 329, 339-40. By completely eliminating any alternative means of obtaining an elective abortion, the MDC policy represents precisely the "exaggerated response to . . . security objectives" that Turner forbids. Turner, 482 U.S. at 97-98.

### 3. Impact on Other Inmates and Prison Resources

The third Turner factor is "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Id. at 90. The MDC contends, similar to its argument relating to security interests, that any increase in the number of outcounts places a strain on financial and staff resources that could have a negative impact on services provided to other inmates.[6] This argument fails for two reasons. First, as discussed

---

[6]The MDC asserts the policy regarding elective abortions represents nothing more than a specific application of a general policy regarding elective procedures. The record belies this claim and demonstrates that abortion is treated differently than other elective procedures. For example, although treatment for a particular injury may be classified as elective, the attending physician may override the policy and authorize the outcount. Conversely, under the MDC policy regarding abortions "[o]utcounts for elective abortions *will no longer be authorized*." (emphasis added).

in Section III(B)1, supra, the policy does not logically reduce the overall number of outcounts. Second, an MDC official admitted the cost savings would be "minimal . . . as compared to our general budget." Thus, this factor also weighs against the reasonableness of the policy. The purported impact of the MDC policy is so minimal that it further demonstrates the MDC policy represents an "exaggerated response to . . . security objectives." See Turner, 482 U.S. at 97-98.

### 4. The Existence of Ready Alternatives

The fourth prong of Turner focuses on the absence or existence of "ready alternatives." 482 U.S. at 90. "[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Id. at 91. As described before, maintaining the current policy results in *de minimis* cost savings, at best, and arguably increases costs, both in terms of financial resources and in terms of risks to staff (due to increased outcounts for prenatal care). Thus, reverting to the previous policy allowing outcounts for elective abortions represents a "ready alternative." Alternatively, the MDC could implement a policy similar to that in Victoria W., requiring inmates to obtain a court order authorizing the abortion. See 369 F.3d at 479. Therefore, this factor also reinforces our holding that the MDC policy cannot withstand scrutiny under Turner.

### C. Eighth Amendment Analysis

In addition to finding the policy invalid under Turner, the district court also found the MDC policy violated Roe's Eighth Amendment right to be free from cruel

and inhumane punishment.[7]  In light of recent developments of the law, this finding was erroneous.

Under the Eighth Amendment, the MDC must "provide medical care for [prisoners]." Estelle v. Gamble, 429 U.S. 97, 103 (1976).  "To prevail on an Eighth Amendment claim of deliberate indifference to serious medical needs, an inmate must prove that he suffered from one or more objectively serious medical needs, and that prison officials actually knew of but deliberately disregarded those needs." Hartsfield v. Colburn, 491 F.3d 394, 396-97 (2007) (citation omitted).

The district court found, for the same reasons outlined in Section III(B), supra, the MDC has knowingly erected a complete barrier to Roe's ability to obtain an elective abortion.   See Roe, 439 F. Supp. 2d at 953.   Thus, the district court determined the MDC administrators must have been aware of the consequences of their actions and were, therefore, deliberately indifferent to the elimination of Roe's access to an elective abortion.  See id.

Beyond the MDC's discredited general argument that pregnant inmates retain access to elective abortions because they can terminate their pregnancies before incarceration, the district court's determination that the MDC policy blocks access to elective abortions is not challenged further.   Rather, the MDC challenges the contention an elective, non-therapeutic abortion represents a "serious medical need." In effect, the MDC contends any elective procedure, by its very nature, cannot

---

[7]Incarceration does not alter the test relating to the constitutional protection against cruel and unusual punishment.  See Johnson, 543 U.S. at 511 (judging Eighth Amendment violations "under the 'deliberate indifference' standard"); see also Hartsfield v. Colburn, 491 F.3d 394, 396 (2007) (citation omitted) ("[I]t is now settled that deliberate indifference is the appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care, and reasonable safety." (citation and internal quotation marks omitted)).

represent a "serious medical need." Indeed, some language in Eighth Circuit precedent appears to support this contention. See Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995) (defining a "serious medical need" as "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the *necessity* for a doctor's attention.") (citation omitted) (emphasis added). Logically, if a procedure is not medically necessary, then there is no *necessity* for a doctor's attention.

A recent district court opinion from the Fifth Circuit supports this contention. See Victoria W. v. Larpenter, 205 F. Supp. 2d 580, 600-01 (E.D. La. 2002). The district court in Victoria W. recognized that other courts had found "serious medical needs" in herniated discs, broken jaws, life-threatening ulcers, risk of suicides, and heart attacks. Id. at 600 (citations omitted). The court then found:

> At its heart, the Eighth Amendment protects prisoners from cruel and unusual punishment and needless suffering. An elective abortion sought for non-medical reasons . . . is simply lacking in similarity and intensity to the other medical conditions that have been found to be serious medical needs under the Eighth Amendment.

Id. at 601. The Victoria W. district court concluded a medically necessary abortion certainly could qualify as a "serious medical need," but "[t]he inconvenience and financial drain of an unwanted pregnancy are simply insufficient in terms of the type of egregious treatment that the Eighth Amendment proscribes." Id.[8]

---

[8]We recognize that, although upheld on appeal, the Fifth Circuit did not expressly adopt this same reasoning. See Victoria W., 369 F.3d at 489-90. The Fifth Circuit reasoned the policy at issue did *not* block access from elective abortions. The policy in Victoria W. simply required the plaintiff to obtain a court order authorizing her to receive an elective abortion. Id. In Roe's case, this reasoning would not apply, because the MDC policy, as discussed in Section III(B), supra, completely denies access to inmates' elective abortions.

On the other hand, the Third Circuit earlier in 1987 rejected reasoning identical to that of the district court in <u>Victoria W.</u>  <u>See</u> <u>Monmouth</u>, 834 F.2d at 348-49.  In <u>Monmouth</u>, the Third Circuit rejected the penal institution's argument that an elective abortion does not represent a "serious medical need."  <u>Id.</u>  In so doing, the Third Circuit majority reasoned:

> That pregnancy itself is not an "abnormal medical condition" requiring remedial, medical attention does not place it beyond the reach of <u>Estelle</u>. Nor does the fact that pregnancy presents a woman with the alternatives of childbirth or abortion affect the legal characterization of the nature of the medical treatment necessary to pursue either alternative . . . .  Here, the relevant medical care is that *necessary* to effectuate the inmates' choices to terminate their pregnancies.  We find that the . . . inmates have firmly demonstrated the seriousness of the needed medical care.

<u>Id.</u> at 348 (emphasis added) (case italicization altered).  The court majority concluded:

> [I]t is evident that a woman exercising her fundamental right to choose to terminate her pregnancy requires medical care to effectuate that choice.  Denial of the required care will likely result in tangible harm to the inmate who wishes to terminate her pregnancy.  Characterization of the treatment necessary for the safe termination of an inmate's pregnancy as "elective" is of little or no consequence in the context of the <u>Estelle</u> "serious medical needs" formulation.  An elective, nontherapeutic abortion may nonetheless constitute a "serious medical need" where denial or undue delay in provision of the procedure will render the inmate's condition "irreparable."

<u>Id.</u> at 349 (case italicization altered).

As to the breadth of its decision, the <u>Monmouth</u> court itself was split on the interpretation of "serious medical need."  <u>See</u> 834 F.2d at 355 (Mansmann, J., concurring). Concurring with the holding that the policy at issue was overbroad under the <u>Turner</u> analysis, Judge Mansmann "stop[ped] short, however, of adopting the

-14-

majority's blanket assumption that the Eighth Amendment is also implicated merely because abortion is a medical procedure[,]" and was "unwilling to join what amounts to a quantum leap to the conclusion that a state's refusal affirmatively to provide elective abortions to female prisoners constitutes cruel and unusual punishment." Id. at 353-54. Judge Mansmann further criticized the majority for "bootstrapping the liberty interest protected by the Fourteenth Amendment into the Eighth[,]" and reasoned that the only way denying elective abortions could be considered cruel and unusual punishment would be to assume "a commonly perceived inhumanity of refusing to provide elective abortions as a general matter." Id. at 355.

Roe cites Johnson v. Bowers, 884 F.2d 1053, 1056 (8th Cir. 1989) for the contention this court adopted the Monmouth majority position and rejected the notion that Eighth Amendment serious medical needs analysis can be reduced to distinguishing "elective" and "medically necessary" care. Bowers, however, does not actually stand for this broad of a proposition. In Bowers, the inmate had been stabbed and suffered nerve damage to his left forearm, leaving the prisoner unable to twist his wrist into a palms up position or to open his hand fully. Bowers, 884 F.2d at 1054. The reviewing physician repeatedly recommended surgery to avoid a permanent handicap. Id. at 1056. We refused to accept the "gratuitous classification of Johnson's surgery as 'elective.'" Id. We further explained such a gratuitous classification "does not abrogate the prison's duty, or power, to promptly provide *necessary* medical treatment for prisoners." Id. (citing Monmouth, 834 F.2d at 348 n.32) (emphasis added). Thus, although citing to Monmouth, Bowers only referenced Monmouth as support for the more limited holding that a *gratuitous* classification of a medial procedure as "elective" will not automatically remove the prison's responsibility to provide treatment, when that treatment is actually "*necessary*" for the health of the prisoner. Id. (emphasis added).

The Supreme Court has made it clear the state has no affirmative duty to provide, fund, or help procure an abortion for any member of the general population. See Rust v. Sullivan, 500 U.S. 173, 178, 203 (1991) (upholding federal regulation

-15-

prohibiting federally funded medical clinics from counseling or referring women for abortion); Webster v. Reproductive Health Serv., 492 U.S. 490, 511 (1989) (upholding Missouri statute prohibiting the use of public facilities or personnel from performing non-therapeutic abortions); Harris v. McRae, 448 U.S. 297, 302, 311, 318 (1980) (upholding congressional restriction of Medicaid funds for any abortion unnecessary to protect the life of the mother, or in cases involving rape or incest).[9]

The views articulated in the Monmouth concurrence and in the Victoria W. district court opinion represent the better interpretation of Eighth Amendment requirements and are more consistent with Supreme Court precedent.  We hold an elective, non-therapeutic abortion does not constitute a serious medical need, and a prison institution's refusal to provide an inmate with access to an elective, non-therapeutic abortion does not rise to the level of deliberate indifference to constitute an Eighth Amendment violation.  On this issue, the district court erred.

---

[9]These cases demonstrate the Monmouth majority decision was exceptionally broad, in that the Monmouth decision also went so far as to hold that the prison was required to fund the procedure for those inmates unable to pay.  Monmouth, 834 F.2d at 344-45 & n.28, 351 (reasoning that the state must pay for treatment of "serious medical needs" under the Eighth Amendment, and finding that elective abortion constitutes such a need).  When courts have found "serious medical needs" those needs have been medical *necessities* society would commonly fund via Medicaid or similar programs for those who cannot afford care.  See Victoria W., 205 F. Supp. 2d at 600.  Medical conditions need not be emergencies in order to be considered serious. See Ellis v. Butler, 890 F.2d 1001, 1003 n.1 (8th Cir. 1989).  However, even the most basic medical provisions classified as serious under Estelle represent care that society has long considered "necessary" and will provide for the indigent.

**IV.  CONCLUSION**

Although the district court erred in finding the MDC policy invalid under the Eighth Amendment, the MDC policy cannot be maintained under the Fourteenth Amendment in light of <u>Turner</u>.  The judgment of the district court is affirmed.

_____